EL PUEBLO DE PUERTO RICO, peticionario, *v.* GUALBERTO NEGRÓN MARTÍNEZ y OTROS, acusados.

*Número:* CE-93-641          *Resuelto:* 30 de abril de 1997

*José A. Andréu Fuentes* y *Héctor R. Crespo Milián,* abogados del peticionario; *Pedro A. Delgado Hernández, Procurador General,* abogado de los acusados.

— o —

Opinión concurrente del Juez Asociado Señor Negrón García.

## I

Es de correcta *juridicidad* la resolución del ilustrado tribunal de instancia (Hon. Molinary De la Cruz, Juez) que denegó la supresión de la evidencia delictiva ocupada por el Estado el 24 de marzo de 1993, al confiscarse la propiedad inmueble y realizarse un inventario.

Originalmente, la Ley Núm. 39 de 4 de junio de 1960 (34 L.P.R.A. ant. sec. 1722) sólo permitía al Estado confiscar "vehículo, bestia o cualquier embarcación marítima o aérea". La Ley Núm. 93 de 13 de julio de 1988 (34 L.P.R.A. sec. 1723 *et seq.*) acuñó el concepto "propiedad" para incluir "sin que se entienda como una limitación, bienes muebles o *inmuebles*, derechos, privilegios, intereses, reclamaciones y valores, dinero en efectivo, vehículos y cualquier otro medio de transportación, utensilios, artefactos, máquinas, equipo, instrumentos y cualquier otro objeto análogo". (Énfasis suplido.) 34 L.P.R.A. sec. 1723.

Actualmente, el estatuto de confiscaciones expresamente impone al funcionario, bajo cuya autoridad se ocupa la propiedad, la obligación de llevar a cabo un "inventario". 34 L.P.R.A. sec. 1723c.

Aun así, los acusados (Negrón-Torres) insisten en la supresión de la evidencia ocupada. Argumentan que a todo registro y allanamiento realizados sin una orden judicial previa apoyada en causa probable, les cobija una presunción de ilegalidad que sólo puede ser rebatida demostrándose que se trata de una de las excepciones o circunstancias que permiten se dispense de dicha orden. Sostienen que el registro "tipo inventario" —excepción adoptada en *Pueblo v. Rodríguez Rodríguez*, 128 D.P.R. 438 (1991)— utilizado como fundamento por el tribunal de instancia para negarse a suprimir, únicamente es aplicable a registros en automóviles o relacionados con las pertenencias de una persona arrestada que va a ser ingresada en una institución penal, no relativos al registro y allanamiento de una residencia. Invocan *South Dakota v. Opperman*, 428 U.S. 364 (1976); *United States v. Parr*, 716 F.2d 796 (11mo Cir. 1983); *United States v. Ladson*, 774 F.2d 436 (11mo Cir. 1985); *U.S. v. Showalter*, 858 F.2d 149 (3er Cir. 1988).

Como segundo argumento, aducen que la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y la Cuarta Enmienda de la Constitución federal son aplicables

a los procedimientos civiles de confiscación, conforme lo resuelto por el Tribunal Supremo federal en *Austin v. U.S.*, 509 U.S. 609 (1992), y este Tribunal en *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984), y en *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945 (1993). Aducen que la Ley Uniforme de Confiscaciones es inconstitucional en la medida en que autoriza al Ejecutivo a llevar a cabo una incautación de propiedad sin intervención judicial previa de clase alguna.

Por su parte, el Procurador General plantea que la evidencia no debe ser suprimida por cualquiera de estas dos (2) razones:

> (i) Los agentes actúan de conformidad con una orden válida de confiscación, de conformidad con autorización estatutaria, o
> (ii) En cualquier caso, aún cuando se considerara inválido el estatuto que autorizaba la confiscación sin orden, procede declarar sin lugar la moción de supresión de evidencia bajo la doctrina del registro de buena fe en la modalidad de actuación autorizada por estatuto, de conformidad con *Illinois v. Krull*, 480 U.S. 340 (1987).

## II

La sentencia, por empate, confirma. Nuestra posición es que no cabe invocar la doctrina "del fruto del árbol ponzoñoso". Se funda en consideraciones de orden público, básicas en nuestro sistema democrático de gobierno, que impiden al Estado sostener la legalidad de una confiscación civil[1] a base de evidencia previamente suprimida —en un procedimiento criminal relacionado— por ser la misma producto de un allanamiento ilegal.

La dificultad de ese razonamiento estriba en que la orden administrativa de confiscación, del Secretario de Justicia, estuvo basada en la evidencia delictiva *válidamente ocupada* durante el allanamiento realizado el 4 de febrero

---

[1] En *Del Toro Lugo v. E.L.A.*, 136 D.P.R. 973 (1994), reiteramos que el procedimiento de confiscaciones es de carácter civil o *in rem*.

de 1993 en la residencia del matrimonio Negrón-Torres, en virtud de una orden judicial.

Según expusimos en nuestra opinión disidente en *Pueblo v. Negrón Martínez II*, 143 D.P.R. 24 (1994),[2] *quedó demostrada la credibilidad a que era acreedor el testimonio del agente Cruz Cortés. No podíamos categóricamente, descartar ni concluir que su declaración, en lo esencial, fue falsa total o parcialmente.* Basada la orden administrativa de confiscación en la ocupación de evidencia delictiva durante el diligenciamiento de esa orden válida de allanamiento previa, es ineludible concluir su validez.

— o —

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri, a la cual se une el Juez Asociado Señor Corrada Del Río.

En el caso de autos el tribunal de instancia resolvió correctamente que era válida la orden de confiscación de una residencia, expedida por el Secretario de Justicia y diligenciada el 24 de marzo de 1993, y que, por ende, también era válida la ocupación por el Estado del material delictivo de "bolita" encontrado ese día en dicha residencia. La orden de confiscación aludida se basó en un registro y allanamiento de la residencia en cuestión, realizado previamente, el 4 de febrero de 1993, durante el cual también se ocupó allí material delictivo de "bolita". Dicho registro y allanamiento fue considerado posteriormente ilegal y se ordenó la supresión de la evidencia obtenida en éste.

La actuación del foro de instancia, en el caso ante nos, responde a conocidos principios jurídicos que presuponen la validez de los actos judiciales y de la actuación del Ministerio Público en situaciones como la de marras.

---

[2] Este caso y el de marras fueron certificados el mismo día.

Nótese que cuando el Secretario de Justicia emitió la orden de confiscación de la residencia en cuestión, ya se había ocupado material delictivo en dicho inmueble, *conforme a una orden judicial presuntamente válida.* El primer registro y allanamiento, realizado previo dictamen judicial, *ni siquiera se había impugnado* cuando se emitió la orden de confiscación de la residencia. Como ya se ha indicado, ese primer registro y allanamiento se realizó el 4 de febrero de 1993. La orden de confiscación que nos concierne aquí se diligenció el 24 de marzo de 1993, *y no fue hasta tres (3) meses después de ese diligenciamiento, el 22 de junio de 1993*, que los dueños de la propiedad impugnaron por primera vez el registro y allanamiento inicial. Además, no fue hasta el *7 de febrero de 1994*, once meses después de emitida la orden de confiscación, que un foro de instancia resolvió que el registro inicial estaba viciado.

En otras palabras, el 24 de marzo de 1993, al diligenciar la orden de confiscación, el Ministerio Público estaba cumpliendo con un mandato estatutario que le requería ocupar la propiedad en cuestión, ya que antes en ésta se había encontrado material delictivo, luego de un registro y allanamiento de dicha propiedad que se había realizado a base de una orden judicial, cuya validez no había sido siquiera impugnada. En ese momento el registro y allanamiento inicial eran presuntamente válidos. El Ministerio Público, pues, no tenía otra alternativa que hacer lo que hizo y no es lógico ni razonable resolver que la orden del Secretario de Justicia, emitida correctamente en el curso ordinario del procesamiento penal, es totalmente nula porque *posteriormente*, once meses después de diligenciarse dicha orden, se resuelve que el registro inicial estaba viciado.

El material delictivo ocupado a raíz del diligenciamiento de la orden de incautación del Secretario de Justicia fue evidentemente obtenido de manera *bona fide.* Resolver de otra forma significaría extender la norma sobre el "fruto del árbol ponzoñoso" a extremos injustificados. Por ello,

coincido con el foro de instancia en que no procedía la supresión de la evidencia delictiva obtenida al ocuparse la residencia en cuestión.

— O —

Opinión disidente emitida por el Juez Asociado Señor Rebollo López, a la cual se une el Juez Asociado Señor Hernández Denton.

Al resolver la controversia hoy ante nuestra consideración, recordamos unas expresiones que este Tribunal hiciera hace aproximadamente treinta y cinco (35) años, en *Pueblo v. Luciano Arroyo*, 83 D.P.R. 573, 585–586 (1961), a los efectos de que:

> Sabemos que el juego ilegal de la "bolita" causa graves males sociales y económicos en Puerto Rico. Por su conducto se escurren grandes sumas de dinero que pertenecen en su casi totalidad a los grupos económicamente débiles; ha facilitado la creación y consolidación de organizaciones criminales profesionales que de esa actividad saltan a otras socialmente más peligrosas, y que constituyen un elemento erosivo aún para la propia fuerza pública, Cf. *Pueblo v. Adorno*, 81 D.P.R. 518 (1959); la continuada presencia de ese juego ilegal en nuestro medio es un reto perenne al régimen de derecho imperante en el país y al respeto que la ciudadanía debe a los funcionarios encargados del orden público. También sabemos que dicho delito, al igual que otros que comprenden la manipulación y posesión de objetos pequeños, es de muy difícil erradicación, y que desde hace tiempo el estado realiza considerables esfuerzos para combatirlo.
>
> *Esas duras realidades sociales no pueden, sin embargo, causar el relajamiento de las normas constitucionales que limitan los procedimientos de investigación y acusación criminal. Ellas son un mínimo de garantías que toda sociedad verdaderamente civilizada se da a sí misma en ánimo de conducir los procedimientos de manera responsable y equitativa, y en el entendido que la justicia humana es esencialmente falible y que urge, por tanto, rodearla de protecciones procesales que atenúen su falibilidad. El relajamiento y la desatención de esas garantías mínimas es un precio demasiado alto a pagar por una mayor*

*eficiencia policíaca.* Cf. *Pueblo* v. *Meléndez,* 80 D.P.R. 787, 803–804 (1958). (Énfasis suplido y escolio omitido.)

I

Este recurso guarda *estrecha relación* con el recurso CE-94-174, en el cual las partes son las mismas. En dicho recurso, el Tribunal en el día de hoy ha emitido una sentencia mediante la cual *confirma* una resolución emitida por el antiguo Tribunal Superior de Puerto Rico, Sala de Ponce. Mediante dicha resolución, el mencionado foro judicial *suprimió* la evidencia que ocuparon las autoridades en la residencia propiedad de los peticionarios Negrón-Torres *el 4 de febrero de 1993,* al diligenciar una orden de allanamiento, sita la misma en el Barrio Higuero de Villalba, Puerto Rico.

En fecha anterior a la mencionada resolución, suprimiendo la evidencia ocupada, esto es, *el 24 de marzo de 1993,* agentes del orden público se personaron a la residencia antes mencionada, propiedad del matrimonio Negrón-Torres, con el propósito de diligenciar una "orden de confiscación" contra la mencionada residencia, *expedida la misma por un fiscal del Departamento de Justicia de Puerto Rico —a nombre y en representación del Secretario de Justicia de Puerto Rico— al amparo de las disposiciones de la Ley Uniforme de Confiscaciones, Ley Núm. 93 de 13 de julio de 1988 (34 L.P.R.A. sec. 1723 et seq.),* acción que culminó en la ocupación de material relacionado con el juego ilegal de la "bolita". *La referida orden de confiscación tenía como "base" la evidencia delictiva ocupada en dicha residencia durante el allanamiento efectuado el 4 de febrero de 1993.*

Habiéndose determinado causa probable, en vista preliminar "en alzada", contra los aquí peticionarios por una supuesta infracción a la Sec. 10 de la Ley Núm. 220 de 15 de mayo de 1948 (33 L.P.R.A. sec. 1256) y radicados los correspondientes pliegos acusatorios ante el antiguo Tribu-

nal Superior de Puerto Rico, Sala de Ponce, los peticionarios radicaron ante dicho foro una solicitud de supresión de evidencia. La misma fue declarada *sin* lugar por el referido foro judicial, luego de la celebración de la correspondiente vista evidenciaria. Adujo el foro de instancia, como fundamentos para su denegatoria, que el Estado actuó amparado en una ley especial, cual es la Ley Uniforme de Confiscaciones, que le autoriza a "confiscar" toda propiedad utilizada en la comisión de delito grave y que la evidencia ilegal que fue ocupada en dicha residencia fue consecuencia del procedimiento de "inventario" que vienen obligados a realizar dichos funcionarios al confiscar una propiedad.

Inconformes, los peticionarios Negrón-Torres acudieron ante este Tribunal, vía *certiorari*, en revisión de la mencionada determinación, imputándole al foro de instancia haber errado

> ... al declarar NO HA LUGAR la Moción de Supresión de Evidencia, y por consiguiente, al determinar que en el presente caso existió algunas [sic] de las circunstancias particulares que validan un registro y allanamiento efectuado sin orden judicial previa.
> ...al determinar que la confiscación llevada a cabo en el presente caso, y por ende el registro y ocupación de la evidencia, no fue una ilegal en violación a la Sección 10 del Artículo II de la Constitución del Estado Libre Asociado y la Cuarta Enmienda de la Constitución de los Estados Unidos de Norteamérica.

Acordamos revisar, esto es, expedir el auto de *certiorari* radicado. Posteriormente, y por estar íntimamente relacionados entre sí los dos recursos antes mencionados, *consolidamos* los mismos. En el día de hoy, y mediante resolución a esos efectos, el Tribunal ha dejado *sin* efecto dicha consolidación.

## II

Antes de proceder a considerar la procedencia jurídica de la solicitud de supresión de los peticionarios Negrón-

Torres —relativa la misma a la evidencia delictiva ocupada por los agentes del orden público al "diligenciar" la orden de confiscación expedida por el Secretario de Justicia de Puerto Rico contra la residencia de los primeros— resulta necesario exponer las disposiciones pertinentes de la *vigente* Ley Uniforme de Confiscaciones, Ley Núm. 93 de 13 de julio de 1988, ante, y las de la *derogada* Ley Uniforme de Confiscación de Vehículos, Bestias y Embarcaciones, Ley Núm. 39 de 4 de junio de 1960 (34 L.P.R.A. ant. sec. 1721 *et seq.*).

La citada, y hoy derogada, Ley Núm. 39 de 1960 (34 L.P.R.A. ant. sec. 1722) sólo permitía la confiscación, por el Estado, de "vehículo, bestia o cualquier embarcación marítima o aérea". La vigente Ley Núm. 93 de 1988, ante, amplió, por decirlo así, la "propiedad" sujeta a confiscación por el Estado. A esos efectos, establece el vigente Art. 2 (34 L.P.R.A. sec. 1723), en lo pertinente, que:

> *Toda propiedad* que sea utilizada en relación a la comisión de delitos graves y de aquellos delitos menos graves en que por ley se autorice la confiscación, cuando tales delitos graves y menos graves estén tipificados en las secs. 3001 *et seq.* del Título 33, en las leyes de sustancias controladas, de armas y explosivos, en las leyes contra el crimen organizado, *en las leyes de juegos prohibidos,* bebidas alcohólicas, leyes fiscales, leyes contra la apropiación ilegal de vehículos, leyes de vehículos y tránsito y de embarcaciones, así como en otras leyes y aquella propiedad que esté sujeta a una sentencia de confiscaciones que así lo autorice, será confiscada en favor del Estado Libre Asociado de Puerto Rico.
>
> *Para fines de este Capítulo el término "propiedad" incluye, sin que se entienda como una limitación, bienes muebles o inmuebles, derechos, privilegios, intereses, reclamaciones y valores, dinero en efectivo, vehículos y cualquier otro medio de transportación, utensilios, artefactos, máquinas, equipo, instrumentos y cualquier otro objeto o bien análogo.* (Énfasis suplido.)

Por otro lado, el Art. 3 (34 L.P.R.A. sec. 1723a) establece que:

> (1) La ocupación de la propiedad sujeta a confiscación se llevará a cabo por la agencia del orden público o el funcionario a

cargo de la implantación de la ley, por sí o por conducto de sus delegados, policías o agentes del orden público *mediante orden de un magistrado o tribunal competente o sin previa orden del tribunal en los siguientes casos*:

(a) Cuando la ocupación se efectúa mientras se lleva a cabo un arresto; o

(b) cuando la ocupación se efectúa en virtud de una sentencia judicial, o

(c) cuando la propiedad a ocuparse *haya sido utilizada en relación a la comisión de cualquiera de los delitos que se expresan en la sec. 1723 de este título previa orden del funcionario a cargo de la implantación de la ley aplicable o sus delegados.*

(2) El funcionario bajo cuya autoridad se efectúa la ocupación o la persona en la que él delegue notificará el hecho de la ocupación y la tasación o valor estimado de la propiedad ocupada a las personas siguientes:

(a) Aquellas que por las circunstancias, información y creencia, el funcionario considere como dueños .... (Énfasis suplido.)

Por último, y en lo pertinente al caso ante nuestra consideración, procede que se señale que la nueva Ley Uniforme de Confiscaciones expresamente establece la obligación, del funcionario bajo cuya autoridad se ocupó la propiedad, de llevar a cabo un "inventario". A esos efectos, dispone el Art. 5 (34 L.P.R.A. sec. 1723c) que:

A la brevedad posible, el funcionario bajo cuya autoridad se ocupó la propiedad entregará al dueño, encargado o persona con derecho o interés en la misma un inventario de la propiedad ocupada.

## III

En relación con la orden de incautación, y eventual confiscación, de la residencia propiedad del matrimonio Negrón-Torres, llevada a cabo el 24 de marzo de 1993, plantea la representación legal de éstos que procede la supresión de la evidencia delictiva que en dicho día ocuparon los agentes del orden público debido, de manera principal, a *dos* (2) fundamentos, a saber: que, conforme las disposiciones constitucionales pertinentes y la jurisprudencia interpretativa de las mismas, a todo registro y allanamiento

realizado, sin que previamente haya sido expedida una orden judicial apoyada en causa probable, le cobija una presunción de ilegalidad que *sólo* puede ser rebatida demostrándose que se trata de una de las excepciones o circunstancias en que se permite que se dispense del requisito mencionado de orden judicial previa. Sostienen los peticionarios que el registro "tipo inventario" —excepción que fue "adoptada" por este Tribunal en *Pueblo v. Rodríguez Rodríguez*, 128 D.P.R. 438 (1991), en relación con el registro de un vehículo de motor y utilizada como fundamento por el tribunal de instancia en el presente caso para denegar la supresión— *únicamente* es aplicable a registros efectuados, precisamente, en automóviles o en relación a las pertenencias de una persona que ha sido arrestada y va a ser ingresada en una institución penal, y no en relación con el registro y allanamiento de una residencia. En apoyo de su posición citan los peticionarios los casos federales de *South Dakota v. Opperman*, 428 U.S. 364 (1976); *United States v. Parr*, 716 F.2d 796 (11mo Cir. 1983); *United States v. Ladson*, 774 F.2d 436 (11mo Cir. 1985), y *U.S. v. Showalter*, 858 F.2d 149 (3er Cir. 1988).

Como segundo fundamento, sostienen los peticionarios Negrón-Torres que las disposiciones de la Sec. 10 del Art. II de nuestra Constitución, L.P.R.A., Tomo 1, y las de la Cuarta Enmienda de la Constitución federal son aplicables a los procedimientos civiles de confiscación, conforme ello ha sido resuelto por el Tribunal Supremo de Estados Unidos en *Austin v. U.S.*, 509 U.S. 609 (1992), y este Tribunal en *E.L.A. v. Coca Cola Bott. Co.*, 115 D.P.R. 197 (1984), y en *H.M.C.A. (P.R.), Inc., etc. v. Contralor*, 133 D.P.R. 945 (1993). Argumentan que, en consecuencia, la Ley Uniforme de Confiscaciones resulta ser inconstitucional en la medida en que autoriza al Ejecutivo a llevar a cabo una incautación de propiedad *sin* intervención judicial previa de clase alguna.

El Procurador General, por su parte, plantea que la evidencia impugnada por los peticionarios no debe ser suprimida "por cualquiera de estas [dos] razones", a saber:

(i) Los agentes actuaron de conformidad con una orden válida de confiscación, de conformidad con autorización estatutaria, o (ii) En cualquier caso, aún cuando se considerara inválido el estatuto que autorizaba la confiscación sin orden, procede declarar sin lugar la moción de supresión de evidencia bajo la doctrina del registro de buena fe en la modalidad de actuación autorizada por estatuto, de conformidad con *Illinois* v. *Krull*, 480 U.S. 340 (1987).([1])

Conforme la norma de abstención judicial respecto a cuestiones constitucionales —esto es, que este Tribunal no entrará a resolver una cuestión constitucional si existen fundamentos, de otra índole, que permitan disponer del caso, *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958)— somos del criterio que resulta ser innecesario dilucidar la constitucionalidad, o no, de la disposición en controversia de la vigente Ley Uniforme de Confiscaciones. En otras palabras, a nuestro juicio no es necesario que nos expresemos sobre si procede la expedición, por el Secretario de Justicia, de una orden administrativa de incautación de una propiedad en aquellos casos en que "la propiedad a ocuparse haya

---

([1]) Resulta, cuando menos, sumamente curioso que el Procurador General "conceda" que la Ley Uniforme de Confiscaciones puede adolecer de vicio constitucional en tanto en cuanto únicamente requiere, para la confiscación de la propiedad, que la misma haya sido "utilizada *en relación con* la comisión de cualquiera de los delitos ...". A esos efectos, expresa el Procurador en su alegato que:

"... Nuestro estatuto autoriza la confiscación sin previa orden judicial 'cuando la propiedad haya sido utilizada en relación con la comisión de cualquiera de los delitos ...', *sin referencia a criterio alguno de causa probable*. Habida cuenta de que los tribunales deben interpretar todo estatuto de forma que la interpretación no engendre dificultades constitucionales, *nuestro estatuto debe ser interpretado a los fines de exigir, al menos, 'causa probable' de que la propiedad ha sido utilizada en relación con la comisión de los delitos señalados en el estatuto.*" (Énfasis suplido.)

Sostiene el Procurador General, sin embargo, que en el presente caso *no* existe problema constitucional alguno por cuanto en el mismo, antes de expedirse por el Secretario de Justicia la orden de confiscación, existía *certeza o constancia* de que la propiedad había sido utilizada en relación con el juego ilegal de la "bolita", esto es, mucho más que causa probable.

sido utilizada en relación a la comisión de cualquier de los delitos"; situación sobre la cual *no* adelantamos criterio alguno por ser ello, repetimos, innecesario en el presente caso.([2])

## IV

Como claramente surge de una somera lectura de las disposiciones de la vigente Ley Uniforme de Confiscaciones que anteriormente transcribiéramos, el referido estatuto autoriza al Secretario de Justicia de Puerto Rico a "ocupar" la propiedad sujeta a confiscación, mediante la expedición de una orden "administrativa" a esos efectos, "cuando la propiedad a ocuparse haya sido utilizada en relación a la

---

([2]) Ello no obstante, resulta pertinente señalar, y enfatizar, que desde *Del Toro Lugo v. E.L.A.*, 136 D.P.R. 973, 984–986 (1994), indicamos que:

"Recientemente, el Tribunal Supremo de Estados Unidos resolvió que se requiere la celebración de una vista previa a una confiscación *de propiedad inmueble. U.S. v. James Daniel Good Real Property et al.*, 62 L.W. 4013 (1913). En este caso, al momento de la confiscación, de acuerdo con la ley federal, 21 U.S.C. sec. 881(a)(7), el propietario había sido convicto por un delito bajo la ley de sustancias controladas del estado de Hawaii. El Tribunal expresó lo siguiente:

" '... *based upon the importance of the private interests at risk and the absence of countervailing Government needs,* we hold that the seizure of real property under [21 U.S.C.] s. 881(a)(7) is not one of those extraordinary instances that justify the postponement of notice and hearing. *Unless exigent circumstances are present, the Due Process Clause requires the Government to afford notice and a meaningful opportunity to be heard before seizing real property subject to civil forfeiture.*

" '*To establish exigent circumstances, the Government must show that less restrictive measures —i.e., a lis pendens, restraining order, or bond— would not suffice to protect the Government's interests in preventing the sale, destruction, or continued unlawful use of the real property.*'... *U.S. v. James Daniel Good Real Property*, supra, pág. 4018.

"A pesar de que en *U.S. v. James Daniel Good Real Property*, supra —por tratarse de una confiscación de propiedad inmueble— no aplica al caso que nos ocupa, *la opinión refleja la tendencia de interpretar restrictivamente las leyes de confiscación.* En esta opinión el Tribunal tomó en consideración la importancia histórica y la vigencia actual del interés privado que representa el derecho propietario a mantener control sobre la propiedad y a estar libre de la interferencia gubernamental. *Allí se expresó que una incautación ex parte crea un riesgo de error inaceptable.* El Tribunal distingue que aunque los estatutos de confiscación constituyen un poderoso instrumento para poner en vigor la legislación de sustancias controladas, la intención del Congreso *no* fue privar a los propietarios inocentes de su propiedad." (Énfasis en el original suprimido, énfasis suplido y escolio omitido.)

comisión de cualquiera de los delitos que se expresan en la sec. 1723 ...". Por otro lado, la referida Ley Uniforme de Confiscaciones le impone la obligación a dicho funcionario de que, a la brevedad posible, realice un "inventario" de lo existente en dicha propiedad. En la realización de dicho "inventario" es que, precisamente, los agentes del orden público encontraron —y ocuparon en el presente caso— material delictivo, relacionado con la Ley de Bolita, en la referida propiedad el 24 de marzo de 1993.

Alega el Procurador General que no procede la supresión de la evidencia delictiva encontrada en la propiedad en controversia el 24 de marzo de 1993, mientras los agentes del orden público realizaban un "inventario" en la misma. Ello, debido a que el Secretario de Justicia, con anterioridad a expedir la orden administrativa de ocupar dicha propiedad, tenía la "certeza o convicción" de que la misma había sido utilizada en la comisión de un delito; certeza o convicción resultante de, o basada en, la evidencia delictiva que había sido encontrada en dicho inmueble al diligenciarse la orden de registro y allanamiento el 4 de febrero de 1993.

No hay duda de que dicho razonamiento, de primera intención, luce convincente. A poco que examinamos el mismo, sin embargo, la situación resulta ser otra; esto es, somos del criterio que procede decretar la supresión de la evidencia delictiva encontrada en dicha propiedad inmueble el 24 de marzo de 1993. Veamos por qué.

Hemos resuelto, de manera enfática, que consideraciones de orden público, básicas a nuestro sistema democrático de gobierno, impiden que se le permita al Estado sostener la legalidad de una confiscación civil a base de evidencia previamente suprimida, en un procedimiento criminal relacionado, por ser la misma producto de un allanamiento ilegal. Al referirnos a la "regla de exclusión", contenida en la Sec. 10 del Art. II de nuestra Constitución,

ante, expresamos en *Toll y Sucn. Rivera Rojas v. Adorno Medina*, 130 D.P.R. 352, 358–359 (1992), en lo pertinente, que:

...[P]odemos decir que la regla de exclusión encarna tres (3) propósitos ínsitos en el Art. II, Sec. 10, *supra*. Primero, disuadir y desalentar a los funcionarios del orden público de que violen la protección constitucional (*deterrence*). Se reconoce que este elemento disuasivo realmente es el más fundamental. Segundo, integridad judicial. Los tribunales no deben ser cómplices de actos de desobediencia a la Constitución y admitir evidencia ilegalmente obtenida. Y tercero, impedir que el Gobierno se beneficie de sus propios actos ilícitos; de otra manera la ciudadanía perdería confianza en el Gobierno.

Además, y como señala el Prof. Ernesto L. Chiesa, la "regla de exclusión" se *extiende* a "evidencia derivativa" que ha sido obtenida como "fruto" de evidencia primaria que ha sido obtenida ilegalmente, esto es, "a otra evidencia cuyo origen está vinculado estrechamente a la evidencia obtenida originalmente en violación de la protección constitucional".[3] *Como resulta obvio, estamos hablando de la llamada doctrina "del fruto del árbol ponzoñozo".*

Esta doctrina, con sus excepciones, encuentra su origen en la jurisprudencia federal norteamericana. Desde principios de siglo, el Tribunal Supremo federal adoptó dicha doctrina —véase *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920)— viéndose obligado luego a "flexibilizarla" con el propósito de lograr un balance adecuado entre los dos (2) intereses principales que, con la misma, se pretenden proteger, cuales son: el interés de *encausar* a los transgresores del orden social y el de *disuadir* a los oficiales que protegen y mantienen el orden público de recurrir a medios o procedimientos ilegales, violentando de esa manera los derechos constitucionales de cada ciudadano.

En el normativo caso de *Silverthorne Lumber Co. v. United States*, ante, en el que se solicitaba la comparecen-

---

[3] E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, 1ra ed., Colombia, Ed. Forum, 1991, Vol. I, pág 317.

cia compulsoria de un testigo ante un gran jurado, testigo del cual se obtuvo conocimiento mediante evidencia ilegalmente obtenida, el Tribunal Supremo federal expresó, en lo pertinente, que:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. *Silverthorne Lumber Co. v. United States*, ante, pág. 392.

Posteriormente, en *Nardone v. United States*, 308 U.S. 338 (1939), dicho Tribunal se enfrentó a una situación en la cual tuvo oportunidad de explicar los criterios que han de regir el orden de la prueba cuando se plantea la doctrina del "fruto del árbol ponzoñoso" como fundamento para suprimir evidencia. A esos efectos, dijo, en lo pertinente:

> The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established —as was plainly done here— the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. *This leaves ample opportunity to the Government to convince the trial court that its proof had an independent origin.*
>
> ... Therefore claims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting what is in the Government's possession before its submission to the jury. And if such a claim is made after the trial is under way, the judge must likewise be satisfied that the accused could not at an earlier stage have had adequate knowledge to make his claim. (Énfasis suplido.) *Nardone v. United States*, ante, págs. 341–342.

Más tarde, en el caso de *Wong Sun v. United States*, 371 U.S. 471 (1963), el referido Tribunal rechazó la tendencia

que engendrara el criterio del *but-for rule*, esto es, el criterio que hacía prácticamente imposible desligar el resto de la evidencia obtenida de la "mancha" (*taint*) de la ilegalidad inicial. A esos efectos, y distinguiendo la situación fáctica de la del caso de *Silverthorne Lumber Co. v. United States*, ante, dijo el Tribunal Supremo federal:

> ... this is not the case envisioned by this Court where the exclusionary rule has no application because the Government learned of the evidence "from an independent source," *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392; nor is this a case in which the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone* v. *United States*, 308 U.S. 338, 341. We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is *"whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."* Maguire, Evidence of Guilt, 221 (1959). (Énfasis suplido.) *Wong Sun v. United States*, ante, págs. 487–488.

Años más tarde, el más alto foro judicial federal entendió procedente establecer otro aspecto, o modalidad, de la llamada excepción de la "fuente independiente". En el caso de *Nix v. Williams*, 467 U.S. 431 (1984), luego de *reiterar* todo lo establecido en los casos previamente citados, el Tribunal se pronunció en cuanto al límite o el alcance de la doctrina —el cual fue necesario aclarar de manera que se evitara el uso desenfrenado y/o arbitrario de la misma— *con el propósito de que los tribunales no perdieran de vista el propósito principal detrás de la adopción de la misma.* Al definir y aplicar la doctrina del "descubrimiento inevitable",[4] el Tribunal hizo hincapié en la necesidad de que claramente se entendiera el fin que se perseguía cuando se

---

[4] Reiterada su validez más tarde en el caso de *Murray v. United States*, 487 U.S. 533 (1988).

creó y desarrolló la regla de exclusión y sus extensiones y/o consecuencias.

Allí, la controversia giraba alrededor del descubrimiento del cuerpo de una niña, alegadamente asesinada por el acusado, el cual había sido enterrado por éste, y cuyo paradero se desconocía. Mientras se llevaba a cabo una búsqueda exhaustiva del área, un agente de la policía obtuvo la información del acusado en violación de su derecho constitucional a estar asistido por un abogado. *El Tribunal adoptó la doctrina del "descubrimiento inevitable"*, señalando que *no* procedía que se ordenara la supresión de dicha evidencia dado que, de haberse continuado la búsqueda, habrían dado con el cuerpo de la niña de cualquier forma.

El razonamiento detrás de la doctrina del "descubrimiento inevitable", *vis à vis* la excepción de la "fuente independiente", según sostuvo el Tribunal, en lo pertinente, es:([5])

> *The core rationale consistently advanced by this Court for extending the exclusionary rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.* This Court has accepted the argument that the way to ensure such protections is to exclude evidence seized as a result of such violations notwithstanding the high social cost of letting persons obviously guilty

---

([5]) Nos ha parecido prudente transcribir, de manera extensa, la exposición que hiciera el Tribunal Supremo federal en el caso de *Nix v. Williams,* 467 U.S. 431 (1984), por su claridad, y, por entender que es la ocasión en que con mayor transparencia explica la importancia del propósito principal detrás de la doctrina de exclusión —*la disuasión.* Véase, además, el comentario *Fruit of the Poisonous Tree—A Plea for Relevant Criteria,* 115 U. Pa. L. Rev. 1136, 1148 (1967), citado con aprobación por el Prof. Ernesto L. Chiesa y por los autores LaFave e Israel. *"Deterrence is the* object *of exclusion and only such exclusion as is likely to produce deterrence is justified. Given the Silverthorne rationale —that the deterrence is to be accomplished not by making evidence unlawfully obtained sacrosanct but simply by removing any gain— it is possible to derive a meaningful and relevant line of 'attenuation' from the Nardone test.*

*The purpose of depriving the government of any gain is to remove any incentive which exists toward the unlawful practice. The focus is forward—to prevent future violations, not punish for past ones ...."*

go unpunished for their crimes. On this rationale, *the prosecution is not to be put in a better position than it would have been in if no illegality had transpired.*

By contrast, the derivative evidence analysis ensures that the prosecution is not put in a *worse* position simply because of some earlier police error or misconduct. The independent source doctrine allows admission of evidence that has been discovered by means wholly independent of any constitutional violation. That doctrine, although closely related to the inevitable discovery doctrine, does not apply here; Williams' statements to Leaming indeed led police to the child's body, but that is not the whole story. *The independent source doctrine teaches us that the interest of society in deterrring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.... When* the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation. There is a functional similarity between these two doctrines in that exclusion of evidence that would inevitably have been discovered would also put the government in a worse position, because the police would have obtained that evidence if no misconduct had taken place. Thus, while the independent source exception would not justify admission of evidence in this case, its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule.

*If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means... then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.*([6]) (Énfasis suplido y en el original, y escolios omitidos.) *Nix v. Williams,* ante, págs. 442–444.

---

([6]) Cabe señalar que en ese caso el Tribunal rechazó la alternativa de requerirle al Ministerio Público probar la ausencia de mala fe por parte del Estado, debido a que, según razonó: "[it] would place courts in the position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity. Of course, that view would put the police in a *worse* position than they would have been in if no unlawful conduct had transpired. And, of equal importance, it wholly fails to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice. Nothing in this Court's prior holdings supports any such formalistic, pointless, and punitive approach." (Énfasis en el original.) *Nix v. Williams,* ante, pág. 445.

Este Tribunal, aun cuando no ha "adoptado" formalmente la doctrina del "fruto del árbol ponzoñozo", *ha "aplicado" la misma en, por lo menos, dos (2) ocasiones.* Véanse: *Pueblo v. Rodríguez Rivera*, 91 D.P.R. 456 (1964); *Pueblo v. Ramos y Álvarez*, 122 D.P.R. 287 (1988).

En *Pueblo v. Rodríguez Rivera*, ante, la defensa intentaba lograr la supresión de una confesión del acusado obtenida al ser confrontado con evidencia fruto de una detención y registro ilegal. En aquella ocasión, resolviendo *en contra* de la supresión de la evidencia en cuestión, dijimos:

> La eficacia de esta norma es tan obvia —por ser una consecuencia lógica de la garantía contra registros ilegales que garantiza nuestra Constitución— *que no vacilamos en adoptarla para esta jurisdicción.* Ahora bien, esto no significa que toda confesión hecha después de un registro ilegal sea inadmisible. Corresponde al acusado establecer —al igual que en cualquier otro incidente sobre supresión de evidencia que se alega ha sido ilegalmente obtenida— *que la misma fue inducida por el resultado del registro ilegal, por la confrontación con sus "frutos".* Tampoco ello obsta para que el Pueblo haga uso de la prueba si *tiene conocimiento de los hechos por una fuente independiente*, pues como se dijo en *Silverthorne Lumber Co.* v. *United States*, 251 U.S. 385, 392 (1920), los hechos descubiertos en esa forma no se convierten en "sagrados e inaccesibles". (Énfasis suplido.) *Pueblo v. Rodríguez Rivera*, ante, pág. 463.

En *Pueblo v. Ramos y Álvarez*, ante, al dirimir la admisión de una confesión recibida con posterioridad a una obtenida ilegalmente, resolvimos *favorablemente* a la admisión de la segunda al entender que "se puede admitir una confesión con posterioridad a una obtenida ilegalmente *siempre y cuando se demuestre que, considerada la totalidad de las circunstancias, se ha roto la cadena de eventos de tal forma que la segunda confesión es voluntaria y libre de los defectos de la primera".* (Énfasis suplido.) Íd., pág. 302.

Como claramente surge de un análisis de las dos (2) antes mencionadas decisiones, *hemos optado por "aplicar" la doctrina del "fruto del árbol ponzoñoso" vía sus*

*excepciones*. La primera de ellas, la existencia de una "fuente independiente" mediante la cual el Estado haya podido obtener evidencia delictiva o incriminatoria desvinculada del proceso o la evidencia viciada, en cuyo caso, el fruto queda fuera del alcance de la regla de exclusión. La segunda de dichas excepciones, el principio del "vínculo atenuado", esto es, el "punto en que el vínculo entre la ilegalidad primaria y el fruto es ya tan atenuado que se pierde el efecto disuasivo en que se funda la Regla de exclusión";(⁷) como consecuencia de lo cual quedaría a salvo la evidencia, o "curado" el vicio.

Manteniendo siempre presente que el *principal propósito* de la regla de exclusión *es la disuación*, esto es, evitar conducta ilegal por parte del Estado que atenta contra los derechos de los ciudadanos, *en la presente situación resolveríamos a favor de la exclusión de la evidencia delictiva ocupada por los funcionarios públicos el 24 de marzo de 1993*. Hoy cobran mayor vigencia las palabras pronunciadas por este Tribunal, hace más de veinte (20) años, en el caso de *Pueblo v. Rodríguez Rivera*, ante, pág. 457, a los efectos de que:

> La comunidad tiene un interés genuino y legítimo en encausar y castigar al ofensor del orden social establecido, pero también tiene interés en proteger al individuo de un proceso en que su convicción se obtenga por métodos y tácticas que no son afines a las prescripciones constitucionales. La selección entre los valores envueltos se hace aún más difícil cuando contemplamos el cuadro vívido de una ascendente incidencia en la comisión de delitos, que justamente tiene que alarmar la conciencia ciudadana. No obstante, *es preciso que prevalezca el criterio que responda más adecuadamente a las exigencias de nuestro sistema democrático que reconoce como cardinal postulado la dignidad del ser humano.* (Énfasis suplido.)

La conducta en que incurriera en el presente caso el agente Cruz Cortés, esto es, el menosprecio que por la ver-

---

(⁷) Chiesa, *op. cit.*, pág. 319.

dad éste demostró, ciertamente es indeseable y reprochable.[8] Su insistencia en ocultar los métodos ilegales de los cuales se valió en la investigación de la válida encomienda que le fuera asignada es censurable. Dicha conducta no debe ni puede ser tolerada por el cuerpo policiaco al cual pertenece; mucho menos por este Tribunal.

En síntesis, somos del criterio que procede decretar la supresión de la evidencia delictiva que fue ocupada el 24 de marzo de 1992 en la residencia del matrimonio Negrón-Torres; ello, por razón de que lo afirmado bajo juramento por el agente Cruz Cortés, en la declaración que sirvió de base a la orden de allanamiento expedida, es falso, total o parcialmente. *Estando basada la orden administrativa de ocupación o confiscación, expedida por el Secretario de Justicia, precisamente en la ocupación por las autoridades el 4 de febrero de 1993 de evidencia delictiva, dicha orden administrativa resulta, igualmente, nula.* Dicho de otra forma, y en vista de lo discutido anteriormente, la mencionada orden administrativa *no* puede prevalecer *por cuanto la misma es el producto, fruto o consecuencia directa del ilegal registro y allanamiento llevado a cabo el 4 de febrero de 1993*; no encontrando evidencia alguna de la existencia de una "fuente independiente", ni de que se haya disipado, o interrumpido, el nexo causal entre la ilegalidad de la actuación del policía y la evidencia que aquí se intenta suprimir. *Pueblo v. Ramos y Álvarez*, ante; *Silverthorne Lumber Co. v. United States*, ante; *Del Toro Lugo v. E.L.A.*, 136 D.P.R. 973 (1994). Así, siendo nula la orden administrativa de incautación expedida por el Secretario de Justicia, procedería igualmente decretar la supresión de la evidencia delictiva ocupada mientras se "diligenciaba" la misma el 24 de marzo de 1993.

---

[8] *"Since the purpose of the exclusionary rule is to deter undesirable police conduct, where that conduct is particularly offensive the deterrence ought to be greater and, therefore, the scope of exclusion broader."* Comentario, ante, págs. 1150–1151.

## V

Acorde con lo antes expuesto, dictaríamos sentencia *revocatoria* de la resolución emitida por el foro de instancia denegatoria de la solicitud de supresión de la evidencia delictiva ocupada por el Estado el 24 de marzo de 1993.