EL PUEBLO DE PUERTO RICO, peticionario, *v.* GUALBERTO NEGRÓN MARTÍNEZ y OTROS, acusados.

*Número:* CE-94-174          *Resuelto:* 30 de abril de 1997

*Pedro A. Delgado Hernández, Procurador General*, abogado del peticionario; *José A. Andréu Fuentes*, abogado de los recurridos.

— o —

Opinión concurrente emitida por el Juez Asociado Señor
   Rebollo López, a la cual se une el Juez Asociado Señor
   Hernández Denton.

El día 30 de diciembre de 1992, en horas de la tarde, al
agente José L. Cruz Cortés, de la División de Control del
Vicio del Área de Ponce de la Policía de Puerto Rico, le fue
encomendada la investigación de una información confi-
dencial, recibida en dicha división por el director de la
misma. La confidencia recibida era referente a supuesta
actividad ilegal —esto es, relacionada con el juego ilegal de
la "bolita"— en una residencia sita en el barrio Higuero de
Villalba, Puerto Rico, propiedad la misma del recurrido
Gualberto Negrón Martínez y su esposa, la recurrida Sonia
Torres Torres.

El Agente Cruz Cortés investigó dicha confidencia du-
rante los días 14 y 21 de enero de 1993, pudiendo *alegada-
mente* observar a varias personas —entre ellos, los recurri-
dos Negrón Martínez y Torres Torres— realizar ciertos y
determinados actos que, conforme su experiencia, eran in-
dicativos de que en dicha residencia se estaba llevando a
cabo actividades relacionadas con el juego ilegal de la
"bolita". Como consecuencia de ello, dicho agente policiaco
prestó una declaración jurada ante un magistrado, expi-
diendo éste la correspondiente orden de allanamiento. La

orden fue diligenciada el día 4 de febrero de 1993. La Policía de Puerto Rico ocupó en la referida residencia material relacionado con el mencionado juego ilegal de la bolita.

Estando pendientes los pliegos acusatorios, que contra los aquí recurridos radicara el Ministerio Fiscal ante la Sala de Ponce del antiguo Tribunal Superior de Puerto Rico —por infracción a la Sec. 10 de la Ley Núm. 220 de 15 de mayo de 1948 (33 L.P.R.A. sec. 1256), que sanciona la operación de una banca de bolita como delito grave— la representación legal de los acusados recurridos radicó ante el foro de instancia una moción de supresión de evidencia; ello al amparo de las disposiciones del inciso (f) de la Regla 234 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. La mencionada disposición reglamentaria permite solicitar la supresión de la evidencia ocupada por el fundamento de que es "insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento *porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente*". (Énfasis suplido.)

Señalada la correspondiente vista evidenciaria, y habiendo sido ocupada la evidencia en virtud de una orden de allanamiento, la defensa —en el descargo de la obligación impuesta por nuestra jurisprudencia, *Pueblo v. Vázquez Méndez*, 117 D.P.R. 170 (1986)— presentó prueba, consistente la misma del testimonio del agente Cruz Cortés. El Estado *no* presentó evidencia alguna. Terminado el desfile de la prueba, el foro de instancia, mediante una *extensa y detallada* resolución escrita, declaró *con* lugar la mencionada solicitud de supresión. En apoyo de su determinación, *expresamente* indicó dicho foro judicial que *no* le merecía credibilidad alguna el testimonio del agente Cruz Cortés, conclusión que fundamentó detalladamente.

Inconforme, el Procurador General de Puerto Rico acudió ante este Tribunal, vía *certiorari*, en revisión de la mencionada determinación, imputándole al foro de instancia haber errado al

... declarar con lugar la moción de supresión de evidencia por razón de no merecerle credibilidad lo afirmado por el agente en la declaración jurada que dio base a la orden de allanamiento.

Ordenamos, a los fines de evaluar el recurso radicado, una transcripción de los procedimientos acaecidos ante el tribunal de instancia en la vista de supresión de evidencia. Elevada dicha transcripción ante este Tribunal, y evaluada la misma, le concedimos término a los acusados recurridos para mostrar causa por la cual no debíamos expedir el auto solicitado y dictar sentencia revocatoria de la resolución recurrida. La parte recurrida compareció, radicando un *fundamentado* escrito en cumplimiento de nuestra resolución.

I

En relación con el allanamiento efectuado en la residencia del matrimonio Negrón-Torres el día 4 de febrero de 1993 —y la resolución emitida por el tribunal de instancia *suprimiendo* la evidencia ocupada en el mismo debido a la determinación de que la declaración del agente Cruz Cortés no le merecía crédito alguno— resulta de *singular y particular* relevancia la decisión que este Tribunal emitiera en *Pueblo v. Bonilla Romero*, 120 D.P.R. 92 (1987), caso en el cual un juez de instancia suprimió la evidencia ocupada, en un allanamiento, por la Policía de Puerto Rico por el fundamento de que la declaración que dio base a la expedición de la orden de allanamiento era falsa, total o parcialmente.

En el caso de *Pueblo v. Bonilla Romero*, ante, págs. 111–112, este Tribunal expresó, *en lo pertinente*, que:

Reiteradamente hemos resuelto que este Tribunal *no* intervendrá con la apreciación y adjudicación de credibilidad que en relación con la prueba testifical haya realizado el juzgador de los hechos a nivel de instancia *en ausencia* de pasión, prejuicio, parcialidad o error manifiesto. Dicha determinación, como es sabido, es *merecedora de gran deferencia* por parte del tribunal

apelativo *por cuanto* es ese juzgador quien, de ordinario, está en *mejor posición* para aquilatar la prueba testifical desfilada *ya que* él fue quien oyó y vio declarar a los testigos. *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Laureano Maldonado v. Tribunal Superior*, ante.

En el presente caso, como hemos visto, el juez que presidió la vista sobre supresión de evidencia *expresamente determinó* que no le merecía crédito alguno el testimonio prestado por el agente Caín Santiago Figueroa, *testimonio que sirvió de base tanto para el arresto, sin orden, del recurrido Bonilla Romero el 18 de septiembre como para la expedición de la orden de allanamiento el 19 de septiembre de 1985.* Debe *enfatizarse* el hecho que el Procurador General de Puerto Rico no alega que el referido magistrado actuara movido por pasión, prejuicio, parcialidad y/o incurriera en error manifiesto al así decidir.

Por otro lado, hemos examinado cuidadosamente la extensa resolución emitida por el Hon. Juez Arnaldo López Rodríguez en donde éste ofrece, en detalle, las razones en apoyo de su determinación de que el testimonio del agente Caín Santiago Figueroa es indigno de crédito. *Si bien es cierto que* entendemos que algunos de los fundamentos por él ofrecidos no son suficientes, por sí solos, para sostener la mencionada determinación, *somos del criterio* que una *evaluación integral* de dichos fundamentos sostiene la misma. *No* puede perderse de vista que fue dicho magistrado quien tuvo ante sí los testigos y quien estuvo en *mejor posición* para apreciar el comportamiento de éstos mientras declararon y la forma en que lo hicieron, la naturaleza o carácter del testimonio prestado, etc. Regla 44(B) de Evidencia para el Tribunal General de Justicia, 32 L.P.R.A. Ap. IV; *Ortiz v. Cruz Pabón*, 103 D.P.R. 939, 947 (1975). Si a ello le añadimos, *repetimos*, que el Procurador General no impugna dicha actuación, forzoso es concluir que no tenemos fundamento alguno para intervenir con esa apreciación. (Énfasis en el original suprimido y énfasis suplido.)

Una lectura de la *igualmente extensa* resolución emitida en el presente caso, de la transcripción de la evidencia y de la comparecencia para mostrar causa de los recurridos, nos convence de que el resultado en el presente caso debe ser igual al del caso de *Pueblo v. Bonilla Romero*, ante. En *primer lugar*, el Procurador General de Puerto Rico en el recurso que radicara en el presente caso —al igual que en el referido caso de *Pueblo v. Bonilla Romero*— *no* le imputa al tribunal de instancia haber actuado movido por pasión,

prejuicio, parcialidad y/o que incurriera dicho foro en error manifiesto al así decidir; meramente *se limita* el Procurador General a señalar que el juez de instancia le debió dar crédito al testimonio del agente Cruz Cortés.

El *impedimento jurídico* con que se confronta la posición del Procurador consiste en que un examen y análisis de la transcripción de evidencia revela que la determinación del juez de instancia, a los efectos de que no le merece credibilidad alguna el testimonio del agente Cruz Cortés, encuentra *amplio apoyo* en la prueba presentada, *determinación que, después de todo, le corresponde hacer, en primera instancia, a dicho magistrado y la cual no debemos alterar a nivel apelativo a menos que se nos demuestre que la misma es arbitraria o constituye un abuso de discreción.* Véanse: *Pueblo v. Cabán Torres,* 117 D.P.R. 645 (1986); *Pueblo v. Bonilla Romero,* ante.

*Coincidimos* con el tribunal de instancia en que resulta sumamente difícil, sino imposible, concederle credibilidad a la declaración que en el presente caso prestara el agente Cruz Cortés. Meramente, *a manera de ejemplo*, señalamos que resulta prácticamente imposible aceptar como cierto el hecho de que dicho agente policiaco pudiera observar —*de noche y a una distancia en exceso de setecientos cincuenta (750) pies*— a unas personas realizar, fuera de la residencia en controversia, unas transacciones que alegadamente denotaban la comisión de unas infracciones a la Ley de Bolita, aun cuando, como *sorpresivamente* alegara el agente al ser confrontado con ese hecho, éste estuviera haciendo uso de unos binoculares.[1]

*Por otro lado*, en la declaración jurada que prestara el

---

[1] El testimonio del agente Cruz Cortés respecto a la utilización de unos binoculares —de su propiedad, esto es, *no* provistos por la División de Control del Vicio— *no* es creíble. Aparte del hecho de que los binoculares afloran en su declaración *luego* de ser éste confrontado con el hecho de que era de noche y que él estaba situado a una distancia considerable de la casa bajo vigilancia, éste *no* pudo precisar la marca de dichos binoculares *como tampoco* los pudo producir en corte a pesar de haber sido requerido para ello.

agente Cruz Cortés para la expedición de la orden de allanamiento, éste describe a la acusada recurrida Sonia Torres Torres como una persona "blanca y bajita"; descripción que *no* concuerda con la realidad física de la misma, siendo ésta una persona "alta y trigueña". Como este Tribunal expresara, en lo pertinente, en *Pueblo v. Falú Fuentes*, 102 D.P.R. 809, 812–813 (1974):

> Aceptamos que una persona pueda equivocarse al calcular la edad, peso y estatura de otro. Pero el que aquí hizo el cálculo no es una persona corriente en estos menesteres. Se trata de un agente de la Policía, con ... experiencia en la persecución del tipo de delito que aquí nos ocupa, entrenado especialmente para hacer esos cálculos y presentar informes exactos de lo que observa. Si se tratase de pequeños errores en sus cálculos sería pasable. Pero aquí se trata de equívocos imposibles de superar.

*En síntesis*, a pesar del hecho de que la determinación que sobre credibilidad hace un juez de instancia no goza de "inmunidad apelativa", esto es, no constituye una "barrera insalvable", la misma merece gran deferencia y *no* deberá ser alterada a nivel apelativo a menos que ésta no encuentre apoyo en la prueba presentada y/o dicha determinación no represente el balance más racional, justiciero y jurídico de la totalidad de la evidencia que desfilara ante el tribunal de instancia y/o se demuestre que el juzgador actuó movido por pasión, prejuicio o parcialidad. *Pueblo v. Cabán Torres*, ante; *Sanabria v. Sucn. González*, 82 D.P.R. 885 (1961). *Esta, ciertamente, no es la situación del presente caso.*

Procede, en consecuencia, la *confirmación* de la resolución emitida por el tribunal de instancia *suprimiendo* la evidencia ocupada por la Policía de Puerto Rico el día 4 de febrero de 1993 en la residencia propiedad de los recurridos Negrón-Torres. Es por ello que *concurrimos con el resultado* al que llega una mayoría de los integrantes del Tribunal en la sentencia que se emite en el presente caso.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Nos apartamos hoy de la sabia admonición expuesta en *Illinois v. Gates*, 462 U.S. 213, 236 (1983), que *condenó* el escrutinio estricto de algunos tribunales al adjudicar una moción de supresión de evidencia:

De igual manera, hemos expresado en reiteradas ocasiones que el escrutinio después de los hechos (*after-the-fact*) que hace un tribunal sobre *la suficiencia de una declaración jurada no debe ser a manera de una revisión de novo.* "La determinación de causa probable [que hace un magistrado] *merece gran deferencia por parte del tribunal revisor*". Spinelli, *supra*, pág. 419. "La actitud negativa o reacia de los tribunales revisores hacia los mandamientos judiciales", Ventresca, 380 U.S., a la pág. 108, *está en conflicto con la marcada preferencia* de la Cuarta Enmienda por los registros autorizados por orden judicial; "los tribunales no deben invalidar los mandamientos judiciales al interpretar las declaraciones juradas de manera excesivamente técnica, en lugar de utilizar el sentido común". Íd., pág. 109.

Si las declaraciones juradas que someten los policías son objeto del tipo de escrutinio que algunos tribunales han considerado apropiado, la Policía podría muy bien recurrir a los registros sin orden judicial, con la esperanza de poder contar con el consentimiento eventual o con que les cubra cualquier otra excepción a la cláusula sobre mandamientos judiciales que pueda surgir al momento del registro. Además, el hecho de que los oficiales que llevan a cabo un arresto o un registro tengan consigo una orden judicial reduce en gran medida la idea de que se está llevando a cabo una intrusión policiaca indebida o ilegal al asegurarle "al individuo cuya propiedad es objeto del registro o de la incautación, que el oficial está autorizado a ejecutar la orden, que es necesario efectuar el registro, y que la autoridad para efectuar el registro está delimitada". *United States* v. *Chadwick*, 433 U.S. 1, 9 (1977). Como reflejo de esta preferencia por la orden judicial, el criterio tradicional de revisión que utiliza el magistrado al determinar causa probable ha sido que mientras éste tenga "base *substancial* para ... concluir" que el registro arrojará prueba de conducta delictiva, la Cuarta Enmienda no exige nada más. *Jones v. United States*, 362 U.S. 257, 271 (1960). (Traducción nuestra y énfasis suplido.)

# I

El 28 de enero de 1993, Joe L. Cruz Cortés, agente de la División de Control del Vicio del área de Ponce, suscribió una detallada declaración jurada ante la Juez Municipal, Hon. Nereida Cortés, para obtener una orden de allanamiento en una residencia ubicada en la carretera Núm. 150, Km. 7.4, Bo. Higuero, Villalba, perteneciente a Gualberto Negrón Martínez y Sonia I. Torres Torres. También pidió permiso para registrar una guagua pick-up, marca Nissan, color negra, de dos puertas, tablilla Núm. 391–480. La Juez Cortés lo autorizó al entender que de los hechos narrados en la declaración existía causa probable de que se estaba violando la Ley de Bolita, Ley Núm. 220 de 15 de mayo de 1948, según enmendada, 33 L.P.R.A. sec. 1247 *et seq.* Esta fue diligenciada el 4 de febrero y allí se ocupó, entre otros, el siguiente material típico relacionado con el mencionado juego ilegal: $25,128.60 en efectivo y cheques; una (1) *trituradora de papeles*; cuatro (4) calculadoras; dos (2) *sistemas de facsímil*; un (1) teléfono inalámbrico; una (1) impresora; una (1) computadora personal con su monitor, base y pantalla de computadora, y una (1) cartera negra con doce (12) balas calibre .357 para revólver Magnum.[1]

Al otro día, Negrón Martínez y Torres Torres fueron denunciados por operar una *banca de bolita.*

Subsiguientemente, el 24 de marzo, agentes del orden público se personaron a la susodicha residencia a diligenciar una *orden de confiscación* expedida por el Fiscal, en nombre y en representación del Secretario de Justicia, al amparo de la Ley Uniforme de Confiscaciones de 1988, Ley

---

[1] Además, se ocuparon dos (2) grapadoras eléctricas; un (1) sacapuntas eléctrico; un (1) lente, tipo cámara; dos (2) lámparas; un (1) reloj; dos (2) tarjetas cajero ATH; una (1) caja con cuatro (4) libretas de cheques en blanco en nombre de Negrón Martínez y de la señora Torres; una (1) perforadora; dos (2) cajas de liguillas; una (1) regla; un (1) recibo de cuenta 08–1140; numerosos lápices y bolígrafos, y dos (2) *jumbo files.*

Núm. 93 de 13 de julio de 1988, según enmendada, 34 L.P.R.A. sec. 1723 *et seq.* Al confiscarse, se realizó un *inventario y volvió a ocuparse material ilegal de "bolita".* Se formularon *nuevas* denuncias contra los esposos Negrón-Torres.

Contra los pliegos acusatorios relacionados con la orden de allanamiento inicial de 4 de febrero —por operar la banca de bolita— los acusados Negrón-Torres pidieron la supresión de la evidencia, para alegar que era ilegal porque la orden fue fundamentada en una declaración total o parcialmente falsa. Regla 234(f) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.[2] Esta moción se presentó con posterioridad a la confiscación de la propiedad el 24 de marzo; *no se impugnó la evidencia obtenida durante esa confiscación.*

En la vista evidenciaria, la defensa presentó una prueba consistente del testimonio del agente Cruz Cortés y del Ing. Benigno Rodríguez Burgos. El Ministerio Fiscal no presentó evidencia alguna. Al ilustrado Tribunal de Instancia, Sala Superior de Ponce (Hon. Francisco Ortiz Rivera, Juez), no le mereció crédito la declaración del agente Cruz Cortés, que dio lugar a la orden de allanamiento, y el 7 de febrero de 1994 suprimió la evidencia.

A solicitud del Procurador General, revisamos vía *certiorari.*[3]

## II

Respecto al allanamiento de 4 de febrero de 1993 —y la resolución del tribunal de instancia que suprimió la evi-

---

[2] Permite solicitar la supresión por el fundamento de que es "insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente". Regla 234(f) de Procedimiento Criminal, 34 L.P.R.A. Ap. II.

[3] Señaló como error: "declarar con lugar la moción de supresión de evidencia por razón de no merecerle credibilidad lo afirmado por el agente en la declaración jurada que dio base a la orden de allanamiento."

dencia ocupada a base de que la declaración del agente Cruz Cortés no le merecía crédito alguno— la sentencia mayoritaria confirma. La premisa en que se funda la mayoría es en el reconocimiento de la deferencia que goza un juez de instancia en sus determinaciones sobre credibilidad, que no serán alteradas a menos que carezcan de apoyo en la prueba, no representen el balance más racional o se demuestre pasión, prejuicio, o parcialidad.[4]

*Distinto de ese respetable criterio, un examen de la declaración jurada y del testimonio del agente Cruz Cortés, según la transcripción de la prueba, nos revela que es enteramente creíble.* Expongamos primero una síntesis de lo detallado en la declaración jurada que prestó dicho agente y *creyó la Juez Cortés al autorizar el allanamiento y que posteriormente, en lo esencial, reiteró en su testimonio ante el Tribunal.* T.E., págs. 3, 83, 86, 88–89, 90, 91–92 y 93.

Cruz Cortés, bajo juramento, dio fe de que el miércoles 30 de diciembre de 1992, el Director de la División de Control del Vicio, Elmer Rivera González, le asignó investigar confidencialmente una información en cuanto a que todos los jueves de 6:00 P.M. a 8:20 P.M., en el Km. 7.4, carretera Núm. 150 de Villalba a Coamo, Barrio Higuero, un señor nombrado Gualberto Negrón Martínez (apodado "Guave", trigueño claro, de estatura mediana, aproximadamente 35–40 años de edad y barrigón) en unión a su esposa Sonia I. Torres Torres (blanca, bajita, de unos 30–35 años de edad), se dedicaban a recibir dinero y material de bolita en su residencia. Para llegar a esa residencia había que salirse de la carretera principal Núm. 150, bajar por un camino vecinal, en cuyo comienzo había un rótulo improvisado: "Se Venden Pasteles". Bajando el camino estaba al frente de una residencia construida de cemento, de color blanco, y, en el techo, una antena parabólica y un calentador solar. En la parte posterior se estaba construyendo una

---

[4] Véanse: *Pueblo v. Cabán Torres*, 117 D.P.R. 645 (1986); *Sanabria v. Sucn. González*, 82 D.P.R. 885 (1961).

piscina, y al frente tenía un sistema de cámara de circuito cerrado.

Consignó que la confidencia mencionaba que esas personas tenían a otro individuo que le manejaba uno de sus autos, *una guagua Nissan negra, tablilla Núm. 391–480*, para recoger material de bolita y llevarlo a la residencia. *Posiblemente tenían una máquina de facímil y una para triturar papeles.* También se dijo que en esa residencia se veía movimiento mínimo, una que otra persona a pie y uno (1) o dos (2) vehículos, incluyendo la referida guagua Nissan, la que salía a varios lugares y regresaba con el material para ser cuadrado.

Buscó en los archivos de la división y *confirmó* que Negrón Martínez y su esposa Torres Torres *habían sido arrestados en varias ocasiones anteriores por infracciones graves a la Ley de Bolita.*

Como resultado, *para corroborar la confidencia*, el jueves 14 aproximadamente a las 6:00 P.M., se personó al pueblo de Villalba. De allí, como a las 6:45 P.M., pasó por la entrada del camino vecinal que da a la residencia y estacionó el auto oficial más arriba de un tanque de agua que queda a mano izquierda y subió la carretera en dirección a Villalba. Salió del auto y bajó la carretera hasta llegar a un lugar donde tenía buena visibilidad hacia la residencia. Observó una *guagua "pick-up" negra*, con las luces encendidas, que comenzaba a subir la cuesta. Regresó de inmediato al auto oficial y bajó por la carretera, dando así tiempo a que la guagua llegara a la Carretera Núm. 150 en dirección al pueblo de Villalba. La siguió y se acercó bastante, hasta poder ver *la tablilla que coincidió con la de la confidencia*. Pasó por *el complejo deportivo y llegó hasta el negocio conocido por Restaurant El Patio en la Carretera Núm. 149. En ese negocio, personalmente había investigado antes infracciones a la Ley de Bolita y se había arrestado personas.* La guagua se estacionó y se bajó un individuo trigueño claro, delgado, de aproximadamente veinte

(20) años, que entró al negocio y se reunió con unas personas que estaban frente a una mesa ubicada fuera del negocio. *Observó con binoculares cuando uno de esos individuos le entregó al individuo de la guagua dinero y unos papeles blancos largos.* Éste, luego de cotejar los papeles, los enroló y, segundos después, se retiró con ellos y se montó en la guagua. Lo siguió por la misma ruta del complejo deportivo, la Carretera Núm. 150, y el camino vecinal donde está el letrero que dice "Se Venden Pasteles" y la cuesta. Estacionó su auto más arriba, se bajó y vio por los binoculares cuando llegó a la residencia y *salió con los papeles blancos en sus manos.* El individuo llegó hasta una puerta, al final de la marquesina a mano izquierda (de madera y cristal o plástico simulando cristal, que en horas de la noche, si hay alguna luz encendida en ese cuarto, puede verse) y tocó ésta. Segundos después abrió la puerta una señora bajita, blanca. Éste entró y cerró la puerta.

Aproximadamente quince (15) minutos después, el mismo individuo salió y se fue en la guagua negra.

Minutos más tarde, llegó un vehículo parecido a un Champ, color crema, con los cristales de atrás ahumados, que tocó bocina; pasó un portón de entrada y se estacionó frente a la marquesina. Se bajó una persona, se encendió la luz de la marquesina y de la residencia salió la misma señora, quien caminó hasta el vehículo. *El conductor sacó del auto una pequeña bolsa de papel de estraza, que entregó a la señora.* Segundos después se retiró en el vehículo y la señora, con la bolsa de papel de estraza en sus manos, entró a la residencia y apagó la luz de la marquesina.

Como a las 8:15 P.M., también observó que llegó frente al portón la *guagua negra, tocó bocina y ocurrió lo mismo.* La luz de la marquesina se encendió, salió la señora, caminó hasta el frente y llegó a la guagua, que estaba estacionada al lado de un canasto de baloncesto. Segundos después vio otra guagua negra, tipo Cherokee. *De la primera guagua se bajó la misma persona y entregó dos (2) bolsas pequeñas de*

*papel de estraza a la señora.* El de la guagua Cherokee (de estatura mediana, gordito, trigueño claro, pelo oscuro corto, guayabera de manga larga, color claro, pantalón y zapatos oscuros) se bajó con una bolsa tamaño mediano de papel de estraza.

Finalmente declaró que vio una construcción de cemento empañetado, sin pintar, que colinda con una finca. Por la parte posterior, observó un techo y unas rejas blancas; éstos colindan con el lago Toa Vaca de Villalba.

No obstante *esta declaración,* el tribunal de instancia no le confirió ningún crédito a su testimonio.

Analicemos sucintamente los incidentes más sobresalientes que movieron al ilustrado foro de instancia a restarle credibilidad.

Al agente Cruz Cortés se le preguntó cómo había recibido la querella. Constantemente declaró que la recibió *en la oficina de su supervisor,* Elmer Rivera González, y que vació su contenido en el Informe de Querellas de 30 de diciembre de 1992. T.E., págs. 3 y 83–84. Enfatizó que la querella, en sí y a modo de confidencia, fue recibida inicialmente por el agente Rivera González y que la redujo a escrito en la hoja de querellas, en horas de la tarde. Declaró, además, que no le preguntó a Rivera González quién le había transmitido la confidencia, porque *corroboró en los archivos de la división que Negrón Martínez y su esposa tenían récord de convicciones previas por infracciones a la Ley de Bolita.* T.E., págs. 31 y 86.

También testificó que, aunque no estaba presente, consignó en el documento que había recibido la confidencia. Reiteró que la recibió personalmente de su supervisor, Rivera González. *En ningún momento dijo que la hubiese recibido personalmente del confidente.* El propio Juez así lo entendió (T.E., pág. 36); sin embargo, en su resolución estimó que dicha explicación era *inaceptable.* Contrario a esa apreciación, el agente Cruz Cortés mantuvo siempre su de-

claración y no titubeó. Señaló que la confidencia la recibió de su supervisor.

En torno a los binoculares que usó durante sus observaciones, el récord demuestra que nunca la defensa ni el tribunal le requirieron *formal y oficialmente* traerlos. T.E., pág. 102. La transcripción de la vista celebrada el lunes 11 de octubre de 1993 sólo revela que uno de los abogados se los había pedido el viernes anterior, 8 de octubre. Aunque en la vista, la defensa intentó poner en duda la existencia de dichos binoculares, el agente Cruz Cortés explicó satisfactoriamente que los había adquirido hacía mucho tiempo en la tienda por departamentos K-Mart, así como su costo. T.E., págs. 7 y 56. Declaró que utilizó los binoculares para observar la residencia a una distancia prudente, con el propósito natural de evitar ser descubierto. Aunque no recordó la marca y el número de serie, aclaró que los binoculares eran de su propiedad y los utilizaba cuando una investigación lo ameritaba. T.E., pág. 56. *Difícilmente podemos tachar de inverosímil su explicación.*

Con referencia a su descripción de una señora "bajita y gordita", el agente Cruz Cortés testificó que dicha persona *no* era la esposa de Negrón Martínez y que la confidencia no coincidía con esa descripción. Sin embargo, su vigilancia *corroboró la existencia de dicha mujer*, la cual el día del allanamiento no se encontraba en la residencia y a la cual no ha podido identificar para fines de su procesamiento. T.E., págs. 66–68. *Aceptó que nunca vio que la señora Torres Torres llevara a cabo lo indicado en la confidencia, conducta que fue realizada por la mujer blanca y bajita. Testificó que vio a la acusada Torres Torres durante el diligenciamiento del allanamiento, y ésta no correspondía a la descripción antes indicada.*

*En resumen, no estamos ante ausencia de prueba o de un testimonio increíble, inherentemente irreal, o improbable, indigno de crédito. Aunque contiene ciertas contradiccio-*

*nes, tampoco se trata de un testimonio descarnado, sino uno lleno de detalles, expositivo de las circunstancias, los objetos y la conducta típica de quienes se dedican al juego ilegal de la bolita.*

## III

Aquí, *la Policía recibió una confidencia; realizó una investigación corroborativa; obtuvo y actuó al amparo de una orden judicial de allanamiento, cuya validez se presume.*

No es función del juez que adjudica una moción de supresión de evidencia *sustituir* el criterio del juez que emitió la orden por el suyo. Al igual que este Tribunal, su función es "estimar si la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable por el magistrado". *Pueblo v. Muñoz, Colón y Ocasio*, 131 D.P.R. 965, 984 (1992). La razón es sencilla: el juicio del magistrado que expide la orden —quien tuvo ante sí al declarante que prestó la declaración jurada— merece posterior deferencia judicial, en cuanto a la credibilidad del declarante y la determinación de causa probable, cuando se adjudica la moción de supresión de evidencia. *La mayoría hoy se aparta de ese sabio enfoque judicial.*

En *Pueblo v. Meléndez Rodríguez*, 136 D.P.R. 587, 615 (1994), al analizar la determinación de causa probable de un magistrado al expedir una orden de allanamiento *a base de una confidencia* que denunciaba la venta de "bolita" en una propiedad, citamos a *Pueblo v. Muñoz, Colón y Ocasio*, supra, y señalamos:

Aclaramos que al aplicar dichos criterios "siempre hemos exigido que la confidencia haya sido corroborada por el agente, ya sea mediante observación personal o por información de otras fuentes". *Pueblo v. Muñoz, Colón y Ocasio*, supra, pág. 983. ... Reiteramos que el análisis de la suficiencia de dichas declaraciones juradas también debe tomar en cuenta los criterios que hemos establecido respecto a los testimonios estereotipados.

Ahora bien, al ejercer nuestra facultad revisora, *no nos corresponde hacer una determinación de novo de causa probable*: "[s]ólo nos corresponde estimar si la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable por el magistrado". (Énfasis en el original suprimido y énfasis suplido.)

Al igual que *Pueblo v. Meléndez Rodríguez,* supra, el caso de autos trata de una *confidencia corroborada.* Luego de corroborarla, el agente Cruz Cortés acudió ante un juez para obtener la orden necesaria para allanar la propiedad en cuestión. La juzgadora en ese momento le creyó al agente. Estimó, como establece nuestra doctrina jurisprudencial, que la evidencia considerada en su totalidad proveía una base sustancial para la determinación de causa probable.([5])

En *Pueblo v. Ortiz Alvarado,* 135 D.P.R. 41, 46–47 (1994), reiteramos lo expresado así en *Pueblo v. Díaz Díaz,* 106 D.P.R. 348, 354 (1977):

... "[U]na confidencia es suficiente para validar la existencia de causa probable si se establece la concurrencia de una o más de las siguientes circunstancias: 1) que el confidente ha suministrado información correcta; 2) que la confidencia conduce hacia el criminal en términos de lugar y tiempo; 3) que la confidencia ha sido corroborada por observaciones del agente, o por información proveniente de otras fuentes; y 4) que la corroboración se relaciona con actos delictivos cometidos, o en proceso de cometerse". ...

Con respecto a la corroboración en sí, destacamos que ésta "no debe limitarse a ver si la conducta observada es inocente o incriminatoria, sino a evaluar el grado de sospecha que conllevan todos los actos de la persona. ... *La investigación policial no tiene que generar por sí misma evidencia suficiente para establecer causa probable. Es suficiente que indique la presencia de alguna actividad sospechosa del carácter sugerido en la confidencia que unido a ella y a otras alegaciones en la declaración jurada pueda razonablemente constituir causa probable."* (Énfasis en el original suprimido y énfasis suplido.)

---

([5]) *Pueblo v. Muñoz, Colón y Ocasio,* 131 D.P.R. 965 (1992); *Pueblo v. Meléndez Rodríguez,* 136 D.P.R. 587 (1994).

No puede ser de otro modo. A fin de cuentas,

[e]l criterio o medida para juzgar si existe causa probable no puede expresarse en términos rígidos y absolutos: la cuestión estriba en determinar si los hechos y las inferencias que se derivan de los mismos, a juicio de una persona prudente y razonable, bastan para creer que se está cometiendo o se ha cometido el delito por el cual la ley autoriza la expedición de una orden de allanamiento. *Carroll v. United States*, 267 U.S. 132 (1925); *Steele v. United States*, 267 U.S. 498 (1925); *Dumbra v. United States*, 268 U.S. 435 (1925). ... [No] es necesario que el juez quede convencido fuera de toda duda razonable de que se está violando la ley. Como indicó el Tribunal Supremo de los Estados Unidos en *Brinegar v. United States*, 333 U.S. 160, 175 (1949), expresamos: "Cuando nos referimos a causa probable ... actuamos a base de probabilidades. Estas no son cuestiones técnicas; se trata de consideraciones prácticas y reales que surgen en la vida cotidiana a base de las cuales actúan hombres prudentes y razonables y no técnicos en derecho. La norma o regla en cuanto a la prueba, por consiguiente, depende de la cuestión que debe probarse. (Énfasis suprimido.) *Pueblo v. Muñoz, Colón y Ocasio*, supra, págs. 979–980.

Y es que

[a]l determinar qu[é] es causa probable no estamos llamados a establecer si la ofensa que se imputa fue verdaderamente cometida. *Nos concierne sólo la cuestión de si el deponente tuvo base razonable, al momento de prestar su declaración jurada y haberse librado la orden de registro, para creer que se estaba violando la ley en el lugar a ser allanado[,] y si los hechos aparentes que se desprenden de la declaración jurada son de tal naturaleza que una persona prudente y razonable pudiera creer que se ha cometido la ofensa imputada, hay la causa probable que justifica la expedición de una orden.* (Citas omitidas y énfasis suplido.) *Pueblo v. Tribunal Superior*, 91 D.P.R. 19, 25 (1964).

Reiteramos que estamos ante una orden basada no sólo en confidencias, sino corroborada y fundamentada por las observaciones de un agente del orden público y vertidas en una declaración jurada. ¿Qué más podemos exigirle a la Policía en la persecución del crimen?

*Revocaríamos la resolución del tribunal de instancia que declaró con lugar la moción de supresión de la evidencia ocupada durante el allanamiento diligenciado el 4 de febrero de 1993.*